UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DAMARIO J. DILLARD,

Petitioner,

v.

MICHAEL OBENLAND,

Respondent.

Case No. C14-5229 JLR-BAT

**REPORT AND RECOMMENDATION**

Petitioner Daniel Dillard seeks 28 U.S.C. § 2254 habeas relief from his 2009 convictions by jury verdict of second-degree murder and two counts of second-degree assault.  Dkt. 8.  Mr. Dillard raises three grounds for federal habeas relief:  (1) trial court erred in the admission of evidence; (2) insufficient evidence to support jury's findings on second-degree murder and second-degree assault; and (3) prosecutorial misconduct.

The Court recommends **DENYING** the petition on the merits as Mr. Dillard has failed to demonstrate that the state-court adjudication of his claims was contrary to, or an unreasonable application of, established federal law, or was an unreasonable determination of the facts in light of the evidence presented.  *See* 28 U.S.C. § 2254(d)(1)–(2).  The Court also recommends that an evidentiary hearing and the issuance of a certificate of appealability be **DENIED.**

REPORT AND RECOMMENDATION- 1

1

# BACKGROUND

2

The Washington Court of Appeals summarized the facts as follows:

3

4

5

      The charges in this case arise from a gang-related shooting that took place in the parking lot of a South Seattle apartment complex in the early morning hours on August 28, 2007.  According to numerous witnesses who testified at trial, Damario Dillard was a member of a street gang known as Deuce 8.  Deuce 8 is based in the Central District of Seattle where Dillard grew up.  In the summer of 2007, there was an ongoing feud between Deuce 8 and an offshoot gang called Low Profile, or LP.

6

7

8

9

      For several days leading up to the shooting, Dillard was staying at the apartment of his friend Amber Corner.  Corner shared a two-bedroom apartment with a roommate, Raquael Grace.  On the evening of August 27, Dillard was with Corner at the apartment with another friend, Laura Jeffries, and a man known as B.G.  Dillard had spent much of the day drinking.  Corner's roommate, Grace, came home.  Two sisters who also lived at the complex came over to visit Grace.

10

      Later in the evening, Grace received a call from her cousin Henry "Jay" Harris.  Harris had been sprayed with mace and asked Grace if he could come over to wash it off and charge up his cell phone.  Harris told Grace that two friends, Antwon Horton and Kevin "Little Calvin" Rogers, were with him.  Horton and Rogers were members of the LP gang.  Although Grace knew about the gang rivalry, she agreed.

11

12

13

      Grace told Corner that her cousin and his two friends were coming over.  She asked Corner what her friends were going to do because Dillard and her guests that were soon to arrive were from "different hoods" and Grace did not want any "drama."  Report of Proceedings (RP) (April 22, 2009) at 56, 59.  Corner agreed that she and her friends would move out of the living room area and stay in her room.

14

15

16

      Harris, Horton, and Rogers arrived at the apartment at 11:30 p.m.  Harris washed up and plugged in his telephone.  The group was eating and watching music videos in the living room.  This was an "uncomfortable situation" for Dillard.  RP (April 22, 2009) at 137.  He sat with his gun on his lap in Corner's room and behaved "[l]ike his nerves were on edge."  RP (April 22, 2009) at 138.  Jefferies decided to call Dillard's friend, another Deuce 8 member, to summon his assistance.  Jeffries told Dillard what she intended to do, and he agreed.  Jefferies did not ask to borrow a telephone from anyone in the living room.  Instead, she left the apartment at about midnight and walked to a nearby Safeway to use the pay phone.  She called Dillard's friend and returned about ten minutes later.

17

18

19

20

      When Jeffries came back, she told Dillard that his friend was on his way.  Dillard said he was going to shoot out the window to "scare these niggas out of here."  RP (April 22, 2009) at 145.  He proceeded to fire three shots out of Corner's bedroom window.  The people in the living room were startled and disconcerted because they did not know where the shots came from.

21

22

23

REPORT AND RECOMMENDATION- 2

Jeffries and Dillard looked out the window and saw two men who resembled Dillard's friends walking toward the complex. Dillard remarked that they had come to get him and walked out of the bedroom. As he walked through the apartment, he passed Harris who was on his way back in to the apartment after moving his car. Harris was surprised to see him, because he had been unaware of Dillard's presence. Dillard left without saying anything.

Grace indicated it was time for Harris and his friends to leave. Unbeknownst to the others, Grace had arranged a secret romantic tryst with Dion "Chicago" Macklin, who was also affiliated with Deuce 8. Macklin had called Grace to tell her he had arrived at the apartment complex. Harris, Horton, and Rogers got ready to leave. Just before 1:00 a.m. on August 28, Grace and her two female friends walked the three guests to the elevator. Simultaneously, Grace received another call from Macklin who was waiting to be let in. During that call, Dillard got on Macklin's telephone and asked Grace why she had "all them niggas up there." RP (April 22, 2009) at 71. Grace responded that they were cousins and in any case, they were leaving. Dillard exclaimed, "They're leaving. They're leaving," and hung up. RP (April 22, 2009) at 72.

When Grace and her friends walked back inside the apartment, Corner was agitated. She jumped on the couch and exclaimed that the Deuce 8s were outside and "[s]omebody is about to die tonight." RP (April 22, 2009) at 75. Grace frantically tried to call Harris's cell phone to warn him.

Meanwhile, Harris, Horton, and Rogers left the building. As they rounded the corner and walked toward Harris's car, they encountered a group of seven Deuce 8 members. Four, including Dillard, were armed. Harris heard one say, "[w]hat's up nigga. What's up with it now." RP (April 15, 2009) at 104. The group collectively fired approximately 30 rounds of ammunition at the three men as they turned and fled. Harris and Rogers were both struck from behind by bullets in the lower legs. Horton was shot in the back of the head and fell face down on the sidewalk.

The shooters scattered and fled in at least two different vehicles. As they were leaving, an onlooker overheard one say, "Did you get him?" RP (April 17, 2009) at 106. Before he left the scene, Dillard discarded his gun behind the tire of an RV in the parking lot.

As Harris hid behind some dumpsters, his telephone was vibrating because Grace was repeatedly trying to call him. Once he thought the shooters had left, Harris retrieved his car keys and limped to his car. As he drove, he answered his telephone and told Grace he had been shot. He stayed on the line with Grace for a few blocks and then pulled into a gas station. He got out of the car and fell to the ground. Medical assistance arrived and Harris was taken to Harborview Medical Center and treated for bone and vascular damage.

Rogers tried to flee on foot and collapsed on a major roadway. He was also treated for his leg injuries at Harborview. Horton suffered massive brain damage. He was pronounced dead later that day at the hospital.

REPORT AND RECOMMENDATION- 3

1

2          The police were not able to find Dillard for several months, but finally
   arrested him in January 2008.  When the police interviewed him, Dillard admitted

3   that he shot a 40–caliber pistol out of Corner's window, and later fired with the others
   in the parking lot.  Dillard denied these actions were the result of gang rivalry.  He

4   said he fired his gun out of the window because he had never fired the gun before.
   He said that when he fired again in the parking lot he was firing in the direction of the

5   LP members, but not at them.  He said he was "caught up in the moment" and "just
   shooting just to be shooting."  State's Ex. at 10, 14.

6          The State charged Dillard with alternate charges of second degree intentional
   murder and felony murder for the death of Horton.  The State also charged Dillard

7   with two counts of assault in the first degree for the assaults on Harris and Rogers.
   Dillard testified at trial.  He denied being a gang member and denied that he felt

8   trapped in Corner's room when the LPs were in the apartment.  Dillard said he
   coincidentally ran into Macklin and some other people who he did not really know

9   after leaving the apartment.  He said he was standing in the parking lot when he heard
   shots and fired his gun in the air in response because he did not know if the shots

10   were being fired at him.  Dillard claimed self-defense, and argued that some of the
   evidence suggested that the LP members may have also been armed or may have

11   provoked the conflict.

12          Following a four-week long trial, the jury convicted Dillard of murder in the
   second degree and two lesser-included charges of assault in the second degree.  With

13   respect to each count, the jury found that Dillard was armed with a firearm.  The trial
   court imposed a standard-range sentence.

14   Dkt. 18, Exhibit 29, pp. 1-6.

15          Mr. Dillard appealed his conviction.  Dkt. 18, Exhibit 26, pp. 1-2.  On May 2, 2011, a

16   panel of the Court of Appeals affirmed Dillard's conviction in an unpublished opinion.  *Id.*,

17   Exhibit 29.  Mr. Dillard's motion for reconsideration was also denied.  *Id.*, Exhibits 30, 33.

18          Mr. Dillard sought discretionary review by the Washington Supreme Court.  *Id.*, Exhibit

19   34.  On November 2, 2011, the Washington Supreme Court denied the petition for review

20   without comment.  *Id.*, Exhibit 36.  The Court of Appeals issued its mandate on December 19,

21   2012.  *Id.*, Exhibit 37.

22          On February 27, 2012, Mr. Dillard filed a pro se personal restraint petition directly with

23   the Washington Supreme Court.  *Id.*, Exhibit 38.  On August 2, 2012, the Commissioner of the

REPORT AND RECOMMENDATION- 4

1    Supreme Court issued a ruling denying the petition.  *Id.*, Exhibit 41.  Mr. Dillard filed a motion

2    to modify the Commissioner's ruling, which the Supreme Court denied without comment.  *Id.*,

3    Exhibits 42 and 43. The Supreme Court issued a certificate of finality on November 13, 2012.

4    *Id.*, Exhibit 44.

5         On October 29, 2012, Mr. Dillard filed a second personal restraint petition with the

6    Washington Court of Appeals.  *Id.*, Exhibit 45.  The Chief Judge of the Court of Appeals rejected

7    Mr. Dillard's claim and dismissed his petition in an order issued on April 12, 2013.  *Id.*, Exhibit

8    48.  Mr. Dillard's motion for discovery review by the Washington Supreme Court was denied.

9    *Id.*, Exhibits 51, 52.  Mr. Dillard's motion to modify the Commissioner's ruling was denied

10   without comment by the Washington Supreme Court on March 5, 2014.  *Id.*, Exhibits 53 and 54.

11   The Court of Appeals issued a certificate of finality on March 26, 2014.  *Id.*, Exhibit 55.

12                              **EVIDENTIARY HEARING**

13        The decision to hold a hearing is committed to the Court's discretion.  *Schriro v.*

14   *Landrigan*, 550 U.S. 465, 473 (2007).  "[A] federal court must consider whether such a hearing

15   could enable an applicant to prove the petition's factual allegations, which, if true, would entitle

16   the applicant to federal habeas relief."  *Landrigan*, 550 U.S. at 474.  In determining whether

17   relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before

18   the state court.  *Cullen v. Pinholster*, ---U.S.---, 131 S.Ct. 1388 (2011).  A hearing is not required

19   if the allegations would not entitle petitioner to relief under 28 U.S.C. § 2254(d).  *Landrigan,*

20   550 U.S. at 474.  "It follows that if the record refutes the applicant's factual allegations or

21   otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."

22   *Id.*; *see also Cullen,* 131 S. Ct. 1388 (2011).  The Court finds it unnecessary to hold an

23

REPORT AND RECOMMENDATION- 5

1  evidentiary hearing because Mr. Dillard's claims may be resolved on the existing state court

2  record.

3  <center>**DISCUSSION**</center>

4  **A.      Claim 1 - Admission of Evidence**

5          In his first ground for relief, Mr. Dillard argues that the trial court erred when it admitted

6  evidence of gang affiliation and evidence that on the day before the shooting he was seen wiping

7  off bullets with a Deuce 8 "flag" (a black bandana) and loading them into a .40 caliber handgun.

8  He also contends that the trial court erred in not granting a defense motion for a mistrial after the

9  jury was inadvertently exposed to a redacted portion of his post-arrest statement.  Dkt. 5-1, pp.

10  12-17.

11          **1)      Evidence of Gang Affiliation**

12          At trial Mr. Dillard denied he was a member of Deuce 8.  Dkt. 18, Exhibit 19, pp. 57-58.

13  However, several witnesses testified he was a self-proclaimed member of Deuce 8 and that he

14  carried a black bandanna -- a Deuce 8 "flag."  *Id.*, Exhibit 8, at 36-37; Exhibit 9, pp. 94-97;

15  Exhibit 10, pp. 135-37; Exhibit 13, p. 49.   There was also evidence that the victims, Horton and

16  Rogers, were members of the rival LP ("Low Profile") gang and that Deuce 8 and LP were

17  involved in a violent rivalry during the summer of 2007.  *Id.*, Exhibit 8, p. 33; Exhibit 9, p. 98;

18  Exhibit 10, pp. 132-33; Exhibit 13, p. 135.

19          In a pretrial ruling, the trial court ruled that evidence of the witnesses' and Mr. Dillard's

20  gang affiliation was admissible at trial:

21                  It appears to the Court that it is extraordinarily difficult to understand the
                events in this case without knowing the claimed gang affiliation of the defendant

22          and/or other people allegedly associated with him via his gang affiliation and
                without knowing the gang affiliation of many of the State witnesses as LPs.  It

23          seems to me that's critical just to understand what happened here and why people
                behaved as they did.

REPORT AND RECOMMENDATION- 6

More significantly, I don't see how the State can move forward on either the intent theory and, of course, the accomplice liability the defendant must share in the intent of whoever fired the fatal shot, in addition to the intent of the person who wounded the other two victims in this case, if it wasn't the defendant himself who did so. And moreover, it's really critical for the jury to understand what would motivate somebody to engage in this behavior. I don't see how this case makes any sense unless the jury knows about gang affiliation.

I completely agree that it's prejudicial information, but the probative value greatly outweighs its prejudicial impact. Certainly, it's unduly prejudicial that it seriously leaves a motive for and to explain the intent to harm in this case.  Also because, as I said, it seems to be classic res gestae evidence in the sense it's hard to understand the events in this case without awareness of gang affiliation.

Dkt. 18, Exhibit 2, pp. 99-100.

The trial court gave the jury the following limiting instruction regarding the gang evidence:

Certain evidence has been admitted in this case for only a limited purpose. Evidence has been introduced in this case to the effect that the defendant was affiliated with a gang or associated with gang members.  This evidence may be considered by you only for the purpose of the defendant's alleged motive and intent to commit the charged crimes and the circumstances surrounding the charged crimes.  Any discussion of the evidence during your deliberations must be consistent with this limitation.

Dkt. 18, Exhibit 23, Instruction 9.

"[A] federal habeas court may not prescribe evidentiary rules for the states."  *Swan v. Peterson*, 6 F.3d 1373, 1382 (9th Cir.1993); *Windham v. Merkle*, 163 F.3d 1092, 1093 (9th Cir.1998) (*citing Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir.1991)).  A state trial court's admission of evidence, even if in violation of state law, does not provide a basis for federal habeas relief unless it rendered the trial fundamentally unfair in violation of due process. *Estelle v. McGuire*, 502 U.S. 62, 67–69 (1991); *Jeffries v. Blodgett*, 5 F.3d 1180, 1193 (9th Cir.1993); *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir.1995)) (*citing Estelle*, 502 U.S. at 67–68).

REPORT AND RECOMMENDATION- 7

1    An evidentiary ruling renders a trial so "fundamentally unfair" as to violate due process

2    only if "there are *no* permissible inferences the jury may draw from the evidence." *Windham*,

3    163 F.3d at 1103 (emphasis in original) (*quoting Jammal*, 926 F.2d at 920); *see also Boyde v.*

4    *Brown*, 404 F.3d 1159, 1172 (9th Cir.2005) ("A habeas petitioner bears a heavy burden in

5    showing a due process violation based on an evidentiary decision.").  Whether or not the

6    admission of evidence is contrary to a state rule of evidence, a trial court's ruling does not violate

7    due process unless the evidence is "of such quality as necessarily prevents a fair trial."

8    *Windham*, 163 F.3d at 1103 (*citing Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th

9    Cir.1986)).

10    Thus, under clearly established federal law, gang evidence is admissible when relevant to

11    a material issue in the case.  *United States v. Abel*, 469 U.S. 45, 49 (1984) (gang affiliation

12    evidence admissible on issue of bias); *United States v. Hankey*, 203 F.3d 1160, 1171–73 (9th

13    Cir.2000) (gang affiliation evidence admissible to establish bias and coercion); *Windham,* 163

14    F.3d at 1103–04 (admission of gang involvement was relevant to prove motive); *United States v.*

15    *Easter*, 66 F.3d 1018, 1021 (9th Cir.1995) (gang affiliation evidence admissible to prove

16    identity).

17    In Mr. Dillard's case the gang affiliation evidence was relevant to establish motive,

18    intent, and accomplice liability, and it was part of the res gestae of the crimes.  It explained his

19    motive and mens rea in voluntarily choosing to be part of a group of men (who were all Deuce 8

20    members) who intentionally fired at least 29 rounds at three other men (two of whom were LP

21    members).  The trial court also gave the jury a limiting instruction to ensure that the jury

22    considered the gang evidence only for appropriate purposes.  Juries are presumed to follow

23    cautionary or limiting instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (describing

1  this presumption as an "almost invariable assumption of the law"); *Brown v. Ornoski*, 503 F.3d

2  1006, 1018 (9th Cir. 2007).

3      Because Mr. Dillard has not demonstrated that the trial court's admission of gang-

4  affiliation rendered his trial fundamentally unfair, this claim should be denied.

5      **2)   Evidence of Use of Gang "Flag"**

6      Mr. Dillard argues that evidence of his use of a gang flag was inadmissible under ER

7  404(b) to show his intent to assault the particular persons who were later shot.  Dkt. No. 5-1, p.

8  15.  The Washington Court of Appeals reviewed the trial court's evidentiary ruling on direct

9  appeal and rejected Mr. Dillard's challenge to this evidence:

10          Dillard first claims that the trial court erred in admitting Jeffries'
     testimony that a day or two prior to the shooting, she saw Dillard cleaning a gun.
11      She said he wiped the bullets with a gang flag and then reloaded them.  Dillard
     argues this was prejudicial evidence showing only a general propensity to commit
12      crimes.  But assuming this was evidence of a prior "bad act" within the ambit of
     ER 404(b), and further assuming the trial court erred in ruling that the evidence
13      was probative of Dillard's intent to commit the charged crimes, the erroneous
     admission of ER 404(b) evidence is harmless unless there is a reasonable
14      probability that the error materially affected the outcome of the case.  State v.
     Halstien, 122 Wn.2d 109, 127, 857 P.2d 270 (1993).  "Improper admission of
15      evidence constitutes harmless error if the evidence is of minor significance in
     reference to the evidence as a whole."  State v. Neal, 144 Wn.2d 600, 611, 30
16      P.3d 1255 (2001).

17          In this case, it was undisputed that Dillard possessed a gun and used that
     gun twice on the night the three victims were shot. Dillard admitted that he fired
18      three shots out the window and later fired the remaining six shots in the parking
     lot. Dillard testified that he knew how much ammunition he had because the day
19      before the shooting, he took the bullets out of the gun, counted, and reloaded
     them. The only thing Jeffries' testimony added was that while doing this, Dillard
20      also wiped the bullets with a gang flag.  This testimony was relevant because it
     was evidence of Dillard's gang affiliation, which he denied.  As Dillard concedes,
21      there was a significant amount of evidence about Dillard's gang association and
     possession of gang flags, so the admission of this piece of information in Jeffries'
22      testimony was merely cumulative and not prejudicial.  And while Jeffries said she
     assumed the purpose of wiping the bullets was to erase any fingerprints, she
23      admitted that this was merely an assumption and that she did not actually know
     anything about guns.

REPORT AND RECOMMENDATION- 9

1

2
>   We conclude that the significance of this evidence was minor.  Given
>   these circumstances, Dillard cannot establish a reasonable probability that
>   Jeffries' testimony that Dillard loaded his gun and wiped the bullets the day
3
>   before the encounter materially affected the outcome of the case.

4   Dkt. 18, Exhibit 29, pp. 6-7.

5   Evidence that Mr. Dillard was handling a firearm and bullets the day before the shooting

6   was relevant of his intent.  The jury could reasonably infer that Mr. Dillard wiped the cartridges

7   to eliminate any physical evidence tying the weapon to him.  No DNA was found on any of the

8   .40 caliber cartridge casings left at the scene of the shooting.  Dkt. 18, Exhibit 15, pp. 46-47; *see*

9   *also* Dkt. 18, Exhibit 14, pp. 21-24 (testimony of Laura Jeffries speculating that Mr. Dillard was

10   wiping the cartridges to remove his finger prints).

11   Evidence that Mr. Dillard specifically used a black bandanna, a Deuce 8 "flag," to wipe

12   the cartridges was relevant to prove his Deuce 8 membership – something Mr. Dillard denied

13   during his testimony. The trial court admitted this evidence to show Mr. Dillard's intent, which

14   was a disputed issue in the case.  Dkt. 18, Exhibit 3, pp. 84-86 ("[I]ntent is not an academic part

15   of this case, it looks like a contested feature of the case.").

16   Because Mr. Dillard has not demonstrated that the trial court's admission of the gang flag

17   evidence rendered his trial fundamentally unfair, this claim should be denied.

18   **3)   Jury's Exposure to Redacted Statement**

19   Mr. Dillard also argues that the trial court erred by failing to grant a mistrial when it was

20   discovered that the jury during its deliberations had been inadvertently allowed to view a

21   redacted portion of his statement to detectives in which he admitted having stolen the firearm he

22   used on August 28, 2007.  He argues "the inadvertent playing of the video was highly prejudicial

23   because Dillard's robbery a day before the shooting was irrelevant and inadmissible under ER

REPORT AND RECOMMENDATION- 10

404(b)."  Dkt No. 5-1, p. 16.

The record reflects that the jury did not receive any evidence that Mr. Dillard forcibly stole the .40 caliber handgun from another person. The portion of Mr. Dillard's pretrial statement, in which he admitted he obtained the gun by beating up and robbing a Hispanic man of his backpack the day before the shooting, was physically redacted from the video of that statement and from the transcript the jurors used as a listening aid during the trial. It was never provided to the jury at any time.  *Compare* Exhibit 24 (unredacted transcript of statement) pp. 20-21 with Exhibit 25 (redacted transcript used at trial) p. 20.  The following passage from Mr. Dillard's statement is what was actually played for the jury inadvertently:

RAMIREZ: How many days you had the 40 caliber before the shooting?

DILLARD: I got it the day before that happened. I stole it from somebody.

RAMIREZ: You stole it from somebody.

DILLARD: Yeah.

Dkt. 18, Exhibit 24, p. 14.  This portion of the video had not been physically redacted; rather it was simply muted when it was played at trial.  And those particular statements appeared only on the video recording; they were not in the transcript provided to the jury.  *Id.*, Exhibit 25 (redacted transcript).

The Washington Court of Appeals rejected Mr. Dillard's claim that the trial court erred when it failed to grant a mistrial:

Dillard next argues that the trial court erred in denying his motion for a new trial.  Pretrial, the parties redacted Dillard's interview with the police.  Most of the redacted material pertained to police questioning of Dillard about other unrelated crimes.  But the parties also agreed to redact Dillard's volunteered admission that he stole the gun the day before the shooting.  The parties omitted this statement in the written transcript of the interview.  And during the trial, when the recorded interview was played for the jury, the prosecutor turned down the volume and muted this statement.  Nevertheless, during deliberations, the jury

asked to view the recording of Dillard's police interview and was inadvertently allowed to hear Dillard's statement that he stole the gun.[1]

After the jury reached its verdict, Dillard moved for a new trial.[2]  The trial court denied Dillard's motion, noting that Dillard's statement about stealing the gun was redacted by agreement, not pursuant to a court ruling.  The court also pointed out that Dillard's statement, "I stole it from somebody," was possibly inaudible, and that even if the jury heard it, it was "extraordinarily unlikely that it had any prejudicial impact."  State's Ex. At 14; RP (May 7, 2009) at 13.  Dillard maintains, however, that this was a serious trial irregularity that warrants reversal of his convictions.

. . .

In the context of all the evidence presented in the case, the brief reference to stealing the gun did not deprive Dillard of a fair trial, particularly since the reference heard by the jury did not include any of the more inflammatory details about the stealing, which actually involved a robbery.  As noted by the trial court, no evidence was presented in violation of a court order or pretrial ruling.  The irregularity, if any, was not so serious or prejudicial as to require a new trial and the court did not abuse its discretion by denying the motion for a new trial.

[1] At a later point during the same interview, Dillard recounted some detail about how he stole the gun, explaining that he beat up someone who he thought was a Mexican, took the person's backpack, and found the gun. This portion was physically redacted from the recording and, contrary to the assertion in Dillard's brief, was not heard by the jury.

[2] Although the transcript refers to a motion for a mistrial, the motion was actually one for a new trial under CR 59(a)(1) based on a prejudicial irregularity in the proceedings.

Dkt. 18, Exhibit 29, pp. 7-9.

In ruling on Mr. Dillard's motion for a mistrial, the trial judge noted that the jury may not even have heard the statement "I stole it from somebody" as it was mumbled so softly as to be virtually inaudible.  *Id.*, Exhibit 21, p. 9.  Moreover, Mr. Dillard's statement about stealing the gun was redacted by agreement and not pursuant to a court ruling.  The trial judge also noted that if he had been asked to rule on that portion of Mr. Dillard's statement, he would have ruled it admissible because "it's part of the res gestae of how Mr. Dillard got the gun" one day prior to the shooting.  *Id*. p. 13.

REPORT AND RECOMMENDATION- 12

1    Mr. Dillard admitted he was armed that night with a fully loaded firearm, admitted he

2    fired three shots from Amber Corner's bedroom window because he was drunk, and admitted he

3    later fired the remaining six rounds in the firearm's magazine in the direction of the three

4    shooting victims.  *Id.*, Exhibit 25 (redacted statement), pp. 4, 9-11, 13-16, 18, 23-24.  The fact

5    that the weapon he used that night had been obtained through theft is only minimally prejudicial.

6    As the trial court observed, it is noteworthy that the jury convicted Mr. Dillard only of the lesser

7    offenses of second-degree assault on counts 2 and 3 rather than first-degree assault as charged.

8    Exhibit 21, p. 13.  Because Mr. Dillard has not demonstrated that the admission of the statement

9    that he stole the gun rendered his trial fundamentally unfair, this claim should be denied.

10    The state appellate courts' adjudication of Mr. Dillard's evidentiary claims was neither

11    contrary to, nor an unreasonable application of, clearly established Supreme Court precedent for

12    purposes of 28 U.S.C. § 2254(d), and it is recommended that Claim 1 be denied.

13    **B.    Claim 2 – Sufficiency of Evidence of Murder and Assault**

14    In his second ground for relief, Mr. Dillard argues that the evidence presented at his trial

15    was constitutionally insufficient to sustain the jury's guilty verdicts[1]. Dkt. No. 5, p. 7.

16    The Constitution forbids the criminal conviction of any person except upon proof of guilt

17    beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358 (1970).  When evaluating a claim of

18    insufficiency of the evidence to support a conviction, the reviewing court must decide "whether,

19    after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

20    could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v.*

21

22    ──────────────

23    [1] Respondent notes that Mr. Dillard appears to abandon the portion of his claim alleging that the evidence regarding the second-degree assault counts was insufficient: "Dillard will and does concede an inference of Second Degree Assault upon Harris and Rogers.  A rational trier of fact could infer that Harris and Rogers were being assaulted by Dillard's admission of firing in the air or towards them."  Dkt. No. 5-1, p. 11; *see also id.* ("Dillard seeks reversal of his murder conviction and resentencing for two counts of Assault in the Second Degree.").

REPORT AND RECOMMENDATION- 13

1   *Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  "*Jackson* leaves juries broad

2   discretion in deciding what inferences to draw from the evidence presented at trial, requiring

3   only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'"  *Coleman v.*

4   *Johnson*, 132 S. Ct. 2060, 2064 (2012) (*quoting Jackson*, 443 U.S. at 319).  The jury is entitled

5   to believe the State's evidence and to disbelieve the defense's evidence.  *Wright v. West,* 505

6   U.S. 277, 296 (1992).

7        To convict Mr. Dillard of the crime of second-degree murder, the State was required to

8   prove that (1) Mr. Dillard or an accomplice intentionally caused the death of Antwon Horton, or

9   (2) Mr. Dillard or an accomplice committed the crime of first- or second-degree assault against

10  Horton and caused Horton's death in the course of or in furtherance of that crime.  RCW

11  9A.32.050 (elements of second-degree murder); RCW 9A.08.020 (accomplice liability); *see also*

12  Exhibit 23, Instruction 13 ("to-convict" for second-degree murder).

13       To convict Mr. Dillard of the crime of second-degree assault (as a lesser offense to the

14  charge of first-degree assault), the State was required to prove that (1) Mr. Dillard or an

15  accomplice intentionally assaulted Harris and Rogers and recklessly inflicted substantial bodily

16  harm, or (2) Mr. Dillard or an accomplice assaulted Harris and Rogers with a deadly weapon.

17  RCW 9A.36.021 (elements of second-degree assault); RCW 9A.08.020; *see also* Exhibit 23,

18  Instructions 38 and 41 ("to-convict" instructions for second-degree assault).  Accomplice

19  liability requires proof that a person, with knowledge that his actions will promote or facilitate

20  the commission of the crime, either "[s]olicits, commands, encourages, or requests" another

21  person to commit a crime or "aids or agrees to aid another person in planning or committing" a

22  crime.  RCW 9A.08.020; see Exhibit 23, Instruction 17 (requirements of accomplice liability).

23

REPORT AND RECOMMENDATION- 14

There was sufficient evidence from which a rational jury could conclude that Mr. Dillard waited outside the apartment building with his fellow Deuce 8 gang members in order to ambush Horton, Harris, and Rogers as they were exiting the building.  When Horton, Harris, and Rogers emerged, Mr. Dillard and three other Deuce 8 members simultaneously fired a hail of 29 bullets at them.  Dkt. 18, Exhibit 9, pp. 104, 127-30; Exhibit 12, pp. 139, 158-59.  Mr. Dillard claimed during his post-arrest interview with the detectives that he did not intend to hit anyone with his gunfire, but he admitted he fired in the direction of Horton, Harris, and Rogers and he admitted he continued to fire until he ran out of bullets.  *Id.*, Exhibit 25 (redacted statement), pp. 9-11, 16. This evidence, viewed in the light most favorable to the prosecution, is more than sufficient to establish that Mr. Dillard was ready to assist the other Deuce 8s in the commission of the crimes of second-degree murder and second-degree assault and did, in fact, assist in their commission by participating in the ambush.  A rational jury could reasonably reject Mr. Dillard's self-serving account in which he had merely fired in the air rather than at the victims.

The Washington Court of Appeals concluded that the evidence was sufficient to sustain the jury's verdicts:

> Forensic analysis of the evidence showed that Dillard did not fire the bullet that killed Horton and there was no way to determine who shot Harris and Rogers. But the evidence was sufficient to show that Dillard was present at the scene and aided in the commission of the crime. Dillard was armed. He waited outside an apartment complex with fellow gang members while Horton, Harris, and Rogers left the building, at which point the group opened fire in the direction of Horton, Harris, and Rogers and that he continued to fire until he ran out of ammunition. This evidence, viewed in the light most favorable to the State, was sufficient to sustain the jury's verdicts.

Dkt. 18, Exhibit 48, p. 3. See also Exhibit 52, p. 2 (Washington Supreme Court Commissioner's ruling).

REPORT AND RECOMMENDATION- 15

1    The state appellate courts' adjudication of  Mr. Dillard's insufficient evidence claim was

2    neither contrary to, nor an unreasonable application of, clearly established Supreme Court

3    precedent for purposes of 28 U.S.C. § 2254(d), and it is recommended that Claim 2 be denied.

4    **C.       Claim 3 – Prosecutor's Closing Arguments**

5           In his third ground for relief, Mr. Dillard contends that a passage from the prosecutor's

6    closing remarks in which he voiced doubt about the truthfulness of Mr. Dillard's testimony and

7    asked the jury to evaluate that testimony closely, invaded the jury's province to determine Mr.

8    Dillard's credibility.  Dkt. 5-1, pp. 17-19.   The prosecutor's remarks at issue are as follows:

9                   There are two questions I will ask you to consider when you are
             evaluating the defendant's testimony. These factors apply to the defendant just as
10           like with anybody else. When he's testifying, he's entitled to the presumption of
             innocence.  He's not entitled to the presumption of truthfulness.  You evaluate his
11           testimony in the same way you evaluate anyone else's testimony.  You take into
             account these factors when they are supported.  Is it supported that he's firing into
12           the air?  Of course not.  How does [sic] the bullet fragments end up all over the
             place?  It doesn't happen just by the bullets flying off into the air.  How does the
13           bullet end up in Evelyn Granger's apartment on the third floor across the way, if
             he's firing up in the air out the window.  Bullets don't do this in the response [sic]
14           of 50 yards.

15                  So these are two questions I would like you to consider when evaluating
             his testimony.  First of all, is it accurate and truthful?  It is not truthful.  Why is it
16           not truthful?  What reason does he have not to talk about the truth.  He has
             personal interest in the outcome.  I means [sic] he's facing three serious charges
17           here, and he has nothing to lose if he said one thing to the police before and now
             he says another.  What he needs is for you to buy it.

18                  MR. MINOR [defense counsel]:  Objection.

19                  THE COURT:  Sustained.

20                  MR. RICHEY [deputy prosecutor]:  When you are looking at his
21           testimony, evaluate whether it is truth and if not, why not.

22   Dkt. 18, Exhibit 20, pp. 50-51.  (The basis for the objection and the court's ruling is not clear).

23

REPORT AND RECOMMENDATION- 16

1    The Washington Court of Appeals rejected Mr. Dillard's challenge to the prosecutor's

2    closing remarks:

3            Taken in the context of the argument as a whole, the issues in the case,
         and the jury instructions, these comments were neither improper nor prejudicial.
4        The deputy prosecutor was discussing how Dillard's testimony at trial was
         inconsistent with the physical evidence and Dillard's earlier statements to the
5        police. …

6            It is misconduct for a deputy prosecutor to express a personal opinion
         about a witness's credibility.  *State v. Reed*, 102 Wn.2d 140, 145-46, 684 P.2d
7        699 (1984).  Here, the deputy prosecutor did not express a personal opinion.
         Rather, the deputy prosecutor instructed the jury that their job was to evaluate
8        Dillard's credibility and that they should consider his personal interest in the
         outcome and the reasonableness of his statements in the context of all of the other
9        evidence.  "[T]here is a distinction between the individual opinion of the
         prosecuting attorney, as an independent fact, and an opinion based upon or
10       deduced from the testimony in the case."  *State v. McKenzie*, 157 Wn.2d 44, 53,
         134 P.3d 221 (2006).  The statements of the deputy prosecutor were not
11       misconduct.

12   Dkt. 18, Exhibit 48, pp. 4-5.  Similarly, the Washington Supreme Court rejected this claim:

13           Here, the prosecutor reminded the jury that it had to evaluate Mr. Dillard's
         testimony and determine whether he was truthful, and if not, why.  In other words,
14       the prosecutor appropriately reminded the jury that its role included determining
         whether Mr. Dillard was credible.  Defense counsel did not object to these
15       specific comments.  To the extent the comments may have been questionable they
         were not so flagrant and ill-intentioned as to be incurable by an instruction.

16
     Dkt. 18, Exhibit 52, p. 3.

17       The relevant inquiry is whether the prosecutor's comments "so infected the trial with

18   unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*,

19   477 U.S. 168, 181 (1986); *Parker v. Matthews*, — U.S. —, —, 132 S.Ct. 2148, 2153 (2012)

20   (per curiam) (*Darden* standard is "clearly established Federal law" for purposes of 28 U.S.C. §

21   2254(d)).  A trial error is presumed to be harmless unless the error had "substantial or injurious

22   effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637

23   (1993).  It is the petitioner's burden to state facts that point to a real possibility of constitutional

REPORT AND RECOMMENDATION- 17

error in this regard.  *See O'Bremski v. Maass*, 915 F.2d 418, 420 (9th Cir.1990).

Closing arguments are not evidence and ordinarily carry less weight with the jury than the court's instructions.  *Boyde v. California*, 494 U.S. 370, 384 (1990); *Houston v. Roe*, 177 F.3d 901, 909 (9th Cir.1999).  Prosecutorial argument should not result in reversal where the trial court instructed the jury that its decision is to be based solely upon the evidence, where the defense did not object, where the comments were an "invited response," or where there is overwhelming evidence of guilt.  *Darden*, 477 U.S. at 182; *Donnelly v. DeChristoforo*, 416 U.S. 637, 640–45 (1974); *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir.1993); *Hall v. Whitley*, 935 F.2d 164, 165–66 (9th Cir.1991).

The prosecutor's remarks in Mr. Dillard's case were not inconsistent with the jury instruction given by the trial court regarding witness credibility in general:

> You are the sole judges of the credibility of each witness.  You are also the sole judges of the value or weight to be given to the testimony of each witness.  In considering a witness's testimony, you may consider these things: the opportunity of the witness to observe or know the things he or she testifies about; the ability of the witness to observe accurately; the quality of a witness's memory while testifying; the manner of the witness while testifying; any personal interest that the witness might have in the outcome or the issues; any bias or prejudice that the witness may have shown; the reasonableness of the witness's statements in the context of all of the other evidence; and any other factors that affect your evaluation or belief of a witness or your evaluation of his or her testimony.

Dkt. 18, Exhibit 23, Instruction 1.  The jury was also advised that lawyers' remarks, statements and arguments are not evidence and that the jury must disregard any remark, statement, or argument that is not supported by the evidence or the law in the jury instructions.  *Id.*  Jurors are presumed to follow the instructions of the court, including instructions that closing arguments are not evidence.  *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000); *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).

REPORT AND RECOMMENDATION- 18

The Washington state courts did not err by rejecting Mr. Dillard's prosecutorial misconduct claim as the prosecutor's comments did not render his trial fundamentally unfair or his conviction a violation of due process. It is "neither unusual nor improper for a prosecutor to voice doubt about the veracity of a defendant who has taken the stand." *United States v. Birges*, 723 F.2d 666, 672 (9th Cir.1984). In fact, in "instances of flatly contradictory testimony on important issues ... it [is] proper for the government to argue that the jury ought not to believe the [defendant's] version." *U.S. v. Molina*, 934 F.2d 1440, 1445 (1991). Mr. Dillard admitted during cross-examination that his trial testimony was at odds with the evidence produced at trial and with his prior statement to the police. Dkt. 18, Exhibit 19, at 149-50, 155. The prosecutor pointed out that Mr. Dillard's trial testimony was inconsistent with the physical evidence and his earlier police statement and reminded jury that they should determine Mr. Dillard's credibility in light of any inconsistencies. Viewed in the context of the closing argument as a whole, the evidence, and the jury instructions, the comments were neither improper nor prejudicial.

The state appellate courts' adjudication of Mr. Dillard's prosecutorial misconduct claim was neither contrary to, nor an unreasonable application of, clearly established federal law and it is recommended that Claim 3 be denied.

**D.    Certificate of Appealability**

If the district court adopts the Report and Recommendation, it must determine whether a certificate of appealability ("COA") should issue. Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). A COA may be issued only where a petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of

REPORT AND RECOMMENDATION- 19

reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Dillard-El v. Cockrell*, 537 U.S. 322, 327 (2003).

The Court recommends that Mr. Dillard not be issued a COA.  No jurist of reason could disagree with this Court's evaluation of his habeas claims or would conclude that the issues presented deserve encouragement to proceed further.  Mr. Dillard should address whether a COA should issue in his written objections, if any, to this Report and Recommendation.

## CONCLUSION

The Court recommends **DENYING** Mr. Dillard's habeas petition on the merits without an evidentiary hearing, and **DENYING** the issuance of a certificate of appealability.

Any objections to this Recommendation must be filed and served upon all parties no later than **Wednesday, August 6, 2014**.  The Clerk should note the matter for **Monday, August 11, 2014,** as ready for the District Judge's consideration if no objection is filed.  If objections are filed, any response is due within 14 days after being served with the objections.  A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served.  The matter will then be ready for the Court's consideration on the date the response is due.  Objections and responses shall not exceed twelve (12) pages.  The failure to timely object may affect the right to appeal.

DATED this  17th  day of July, 2014.


_____
BRIAN A. TSUCHIDA
United States Magistrate Judge

REPORT AND RECOMMENDATION- 20